UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

ERIC SPRINGER and MAURICE J.
SEGHERS, JR., on behalf of themselves
and all others similarly situated,

CASE No. 09-81470-CIV-MARRA

        Plaintiffs,

vs.

**COMPLAINT – CLASS ACTION**

TIGRENT, INC, (f/k/a WHITNEY
INFORMATION NETWORK, INC.),
EDUTRADES, INC., WEALTH
INTELLIGENCE ACADEMY, INC.,
LINDA WOOLF, DAVID GENGLER,
HANDS ON CAPITAL, INC., and
LASHAICO, INC.

        Defendants.

_____/

## <u>AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs, Eric Springer and Maurice J. Seghers, Jr. ("Plaintiffs"), individually

and as representatives of a Class of similarly-situated individuals ("Class Members"),

bring this Complaint against Linda Woolf, David Gengler, Hands On Capital, Inc., and

Lashaico, Inc., (collectively, "Woolf and Gengler"), and Tigrent, Inc. (f/k/a/ Whitney

Information Network, Inc.), EduTrades, Inc., Wealth Intelligence Academy, Inc.

(collectively, "Whitney"), and alleges the following:

### <u>Summary of the Case</u>

1.    This is a class action brought on behalf of all persons who purchased

investor-education products sold under the "Teach Me to Trade" ("TMTT") brand after

attending a TMTT workshop or seminar.

2.      From late 2002 through at least 2006, Whitney promoted TMTT as a proven method for teaching regular people how to achieve wealth and financial independence. Whitney marketed TMTT "packages," which included software, classes, and personal "mentoring," as having been designed for novices with little or no experience with the stock market.

3.      TMTT products and services were sold to customers at seminars or "workshops" held in local hotels throughout the United States. At those seminars, TMTT sales staff aggressively pushed attendees to purchase TMTT packages costing tens of thousands of dollars and even encouraged them to go into debt to do so. Attendees were assured that, if they could follow simple steps, they could quickly recoup the costs of the TMTT products and start making money in just a few minutes per day.

4.      At TMTT seminars, however, sales speakers employed a "pitch" that was filled with misrepresentations and omissions. TMTT sales staff knowingly and repeatedly lied to seminar attendees about their trading expertise, their experiences with TMTT, the qualifications of TMTT instructors and "mentors," the simplicity and effectiveness of the TMTT system, and the success enjoyed by previous TMTT purchasers.

5.      Lured by the deceptive TMTT presentations, thousands of people, including Plaintiffs, squandered precious financial resources, often incurring onerous debt, on TMTT's "educational" products, only to find out that the TMTT sales speakers had lied to them, and that those speakers were not successful traders, the TMTT instructors  and "mentors" were not well-trained professional traders, the TMTT

2

strategies were not simple to learn or implement, and those strategies did not produce the promised results.

6. The fraudulent practices employed by TMTT sales speakers were exposed during the recent federal criminal trial of Linda Woolf and David Gengler, TMTT's two top sales speakers (*U.S. v. Linda Woolf and David Gengler*, Case No. 08-cr-00012, E.D. Va.). Both Woolf and Gengler were convicted of conspiracy and fraud charges for their conduct in selling the TMTT system.

7. The evidence and testimony presented at the Woolf/Gengler trial established that (1) Woolf and Gengler engaged in a criminally fraudulent scheme to defraud TMTT seminar attendees; (2) Whitney was aware of the fraudulent misrepresentations made by Woolf and Gengler and approved of their conduct and/or did nothing to stop it; and (3) other TMTT sales speakers were trained by Woolf and Gengler, used the slide presentation developed by Woolf, and emulated Woolf and Gengler's sales techniques in their own seminar presentations.

8. Through this lawsuit, Plaintiffs seek to recover, for themselves and all other similarly-situated TMTT purchasers, a full refund of the amounts they were fraudulently induced to spend on TMTT products and services, together with any other legal and equitable relief to which they may be entitled.

## I.   THE PARTIES

9. Plaintiff Eric Springer, is a citizen of the State of Florida who resides in Brevard County. He attended a TMTT seminar held in December 2003 in Orlando, Florida. During and/or after that seminar, he purchased TMTT products and services, including software, classes and personal "mentoring," at a cost of more than $20,000.

10.     Plaintiff Maurice J. Seghers, Jr., is a citizen of the State of Louisiana who resides in Jefferson Parish. He attended a TMTT seminar held in March 2005 in New Orleans, Louisiana. During and/or after that seminar, Plaintiff purchased TMTT products and services, including software, classes and personal "mentoring," at a cost of more than $30,000.

11.     Plaintiffs bring this action on their own behalf and on behalf of the following class of persons (the "Class"):

All persons who paid to attend a TMTT seminar and/or purchased TMTT products or services, and who have not subsequently received a full refund of the money they spent on those products or services.

12.     Excluded from the Class are the Defendants; officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; the affiliates, legal representatives, attorneys, heirs or assigns of any Defendant; and any federal, state or local governmental entity, and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staffs. Plaintiffs reserve the right to modify or amend this Class definition if discovery and/or further investigation so necessitate.

13.     Defendant Linda Woolf is a resident of Utah, who made millions of dollars in commissions selling TMTT products and services.

14.     Defendant Hands On Capital, Inc. ("Hands On Capital") is a Utah corporation established by Woolf. Woolf's commissions from the sale of TMTT packages were paid to Hands On Capital through an agreement between Hands On Capital and entities affiliated with TMTT.

15.     Defendant David Gengler is a resident of Utah, who made millions of dollars selling TMTT products and services.

16.     Defendant Lashaico, Inc., ("Lashaico") is a Utah corporation established by Gengler. Gengler's commissions from the sale of TMTT packages were paid to Lashaico through an agreement between Lashaico and entities affiliated with TMTT.

17.     Defendant Tigrent, Inc. (f/k/a Whitney Information Network, Inc.) ("Whitney") is a publicly-traded Colorado corporation company with its principal place of business in Cape Coral, Florida. Whitney acquired the TMTT brand in July 2002.

18.     Defendant EduTrades, Inc. ("EduTrades") is a Nevada corporation with its principal place of business in Cape Coral, Florida. EduTrades is a subsidiary of Whitney that was established in 2005 and now owns and markets TMTT products and services.

19.     Defendant Wealth Intelligence Academy, Inc. ("WIA") is a Florida corporation with its principal place of business in Cape Coral, Florida. WIA is a subsidiary of Whitney that was established in 2004 and owned and marketed TMTT products and services for some time before the brand was transferred to EduTrades.

## II.     JURISDICTION AND VENUE

20.     This Court has jurisdiction over this class action, pursuant to 28 U.S.C. § 1332 (d), as:

- The aggregated "amount in controversy" for the claims asserted herein on behalf of the members of the Class exceeds $5,000,000, exclusive of interests and costs;

- At least one member of the Class is a citizen of a State different from that of a Defendant;

- Fewer than one-third of the members of the Class are citizens of Florida;

- None of the defendants are States, State officials, or other governmental entities;

- There are more than 100 members in the Class;

- This action does not involve a "covered security" as defined in section 16(f)(3) of the Securities Act of 1993 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

- This action does not relate to the internal affairs or governance of a corporation;

- This action does not relate to the rights, duties, and obligations relating to any security (as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 78b(a)(1)).

21.     Venue is proper in this Court under 28 U.S.C. § 1391 and pursuant to the "Jurisdiction/Venue" clause of the standard-form "Student Agreement" executed by TMTT purchasers.

## III.     FACTUAL ALLEGATIONS

### The TMTT Marketing Strategy

22.     From the time it purchased TMTT in 2002, through at least 2006, Whitney marketed TMTT products with various promotional materials, including "infomercials," and direct mailings. Those TMTT advertisements invited people to register for a free one-day seminar at which they could learn more about the TMTT system.

23.     At the free TMTT seminars, speakers offered basic information about the TMTT system and solicited attendees to participate in an more in-depth three-day "investor's workshop." The cost to attend the TMTT three-day workshops was typically around $200-$400.

24.     At the three-day seminars, TMTT sales speakers provided some additional information about the TMTT, but they primarily used the opportunity to convince their

6

"captive audience" that they should commit to their "education" by purchasing expensive TMTT "packages," which included software, advanced classes, and personal "mentoring" by "expert" professionals. The TMTT packages marketed at the three-day seminars cost anywhere from a few thousand dollars to more than $60,000.

25.     TMTT sales speakers were paid percentage commissions on the TMTT products and services sold at the TMTT seminars.

26.     At the three-day seminars, TMTT sales speakers instructed attendees to disclose their finances to TMTT "success coaches," ostensibly to help develop a financial strategy. In reality, however, the purpose of the financial review was to identify "how much money was in the room" and to allow TMTT sales staff to target individuals with the means to purchase more expensive TMTT packages. Not surprisingly, TMTT speakers and success coaches suggested that attendees take whatever steps necessary to free up as much funds as possible for TMTT packages and trading.

27.     TMTT sales speakers also openly encouraged seminar attendees to go into debt to purchase TMTT packages. TMTT sales staff went so far as to provide scripts for attendees to use to get credit-card companies to increase their borrowing limits so they could afford TMTT packages. Attendees were assured that they could easily recoup the costs of the TMTT products within months by using the TMTT strategies.

28.     To convince seminar attendees that the TMTT system was a sound investment, sales speakers used a sales pitch that was carefully crafted to allay seminar attendees' concerns about the knowledge, skill, capital, and time commitment required to implement the system, the quality and expertise of the TMTT instructors and mentors, and the high cost of the TMTT program. Specifically, TMTT speakers assured potential

7

purchasers that even people with no experience and very little money could be successful with the TMTT system, that the TMTT program was taught and operated by well-educated, experienced, professionals, and that the cost of the TMTT packages could be quickly recouped by following the system.

29.    In making their sales pitch, however, TMTT sales speakers knowingly made numerous misrepresentations, including:

- misrepresentations about the speakers' own purchase and use of TMTT products, including the way in which they came to discover the TMTT system and the level of success they were able to achieve using that system;

- misrepresentations about the speaker's own experience, education, and expertise, and that of the TMTT instructors and "mentors";

- misrepresentations about the ease with which inexperienced novices could learn the TMTT system and begin to make money, and the amount capital, skill, and time required to achieve positive results; and

- misrepresentations about the number of previous TMTT purchasers who made money using the TMTT system and the levels of success those purchasers were able to achieve.

30.    All of the misrepresentations made by TMTT sales speakers were specifically designed to convince seminar attendees that,

- the TMTT system was proven, reliable, and easy to use, and would produce positive results;

- the TMTT system was run and taught by well-educated, experienced professionals who would share their expertise and insights with TMTT purchasers and accelerate their pace of learning and success;

- people with little or no experience, most notably the TMTT sales speakers, had learned the TMTT system without difficulty and had quickly achieved financial independence;

- all that was required to earn money trading with the TMTT system was adherence to a few simple no-lose strategies and a minimal time commitment;

- virtually everyone who purchased the TMTT system made money.

31.    The TMTT sales speakers knew that the representations they made were false and deceptive, as many of those statements were outright lies about the speakers' own personal experiences, and others were made without any factual support whatsoever. The extent of the fraudulent practices employed by TMTT sales speakers was recently exposed at the criminal trial of TMTT's two top sales speakers, Linda Woolf and David Gengler, who both were convicted of criminal conspiracy and wire fraud charges for their conduct in conducting TMTT seminars (*U.S. v. Linda Woolf and David Gengler*, No. 1:08cr12, E.D. Va., Alexandria Division). These speakers trained the TMTT sales force, passing on their deceptive techniques to all other speakers. Thus, their behavior is illustrative of the entire TMTT sales force.

### Woolf and Gengler's Fraudulent Conduct

32.    After considering the evidence presented at trial, a federal jury determined that Woolf and Gengler had engaged in a conspiracy to defraud TMTT purchasers by knowingly and fraudulently misrepresenting and/or omitting material facts in TMTT advertisements and at the TMTT "investor workshops" they conducted. Specifically, Woolf and Gengler were convicted of lying about (1) their own alleged purchase and use of the TMTT system; (2) the extent of their own stock-trading activity, expertise, and success; (3) whether the TMTT system was a proven method for successful stock trading; (4) the experience and expertise of the TMTT instructors and "mentors"; (5) the level of success experienced by previous TMTT purchasers; and (6) the ease with which inexperienced TMTT purchasers could achieve similar success. The jury further found that those misrepresentations were "material," in that they were the sort of misrepresentations likely to convince a reasonable person to purchase TMTT products.

9

33.     Numerous TMTT customers who attended seminars conducted by Woolf and/or Gengler testified at trial that they relied on those misrepresentations in deciding to purchase TMTT packages.

34.     At the heart of Woolf and Gengler's fraud were the compelling stories they told about their own experiences with TMTT. They and the other Defendants encouraged the rest of the TMTT sales force to emulate their example. For example, Woolf claimed that she first decided to attend a TMTT workshop as a recently-divorced school teacher living in a basement with her children. She described how she went deep into debt to purchase the TMTT system, including personal "mentor" services, even though she made very little money and knew nothing at all before purchasing TMTT. Woolf claimed that, within weeks of purchasing the TMTT system, she had replaced her entire teacher's salary with income generated using the TMTT system and had recouped the cost of the TMTT course. Woolf told seminar attendees that she had no idea it was so easy to learn how to make money, and she reported that she now made more money working twenty to thirty minutes each day using the TMTT system than she had made in any of her previous occupations.

35.     In fact, Woolf's story was a lie. She never purchased any TMTT products and never hired a TMTT personal "mentor." Her only experience with TMTT was in her capacity as a professional sales speaker and trainer. Woolf joined TMTT shortly after Whitney acquired the brand in late 2002, after having conducted investor-education seminars for the now-defunct Wade Cook Financial Corporation. She also operated a nail salon with her husband, whom she later trained to become a TMTT sales speaker.

Contrary to her claim that she had discovered TMTT as a recent divorcee, Woolf and her husband had been married for many years before TMTT even existed.

36.     Woolf also lied about making a living using the TMTT system and made specific misrepresentations about her trading successes. The rest of the TMTT sales force was encouraged to emulate her example. Of course, Woolf did make a considerable fortune from TMTT, but that fortune came from the millions of dollars in commissions she made fraudulently inducing individuals to purchase TMTT products — not from using the TMTT system.

37.     David Gengler employed a similar technique in his sales presentations. He also claimed to have discovered the TMTT system under trying circumstances, as a young father deep in debt and concerned about his family's future. Gengler described how he made the difficult decision to go even deeper into debt to purchase the system and how he quickly learned the TMTT strategies under the guidance of his TMTT personal "mentor." Gengler also claimed that he quickly recovered the cost of the TMTT system and now made a great living using the TMTT system. Gengler often displayed photographs of the "dream home" he was allegedly building with the income he made by following the TMTT strategies.

38.     Gengler's personal story also was a lie. He did not go into debt to purchase the TMTT system as a young father worried about his family's future. In fact, he never purchased TMTT products or services at all. Before joining TMTT as a sales speaker, Gengler worked as a stock broker at Maverick Trading, the company that initially developed the TMTT concept. When Whitney purchased TMTT from Maverick in 2002, it hired one of Maverick's executives to head up the TMTT brand, and that

executive recruited Gengler to be a sales speaker.   Gengler trained under Woolf, attending her seminars and speaking with her on numerous occasions.

39.    Gengler also lied about making a living using the TMTT system. Actually, Gengler did not purchase the TMTT products and did not hire a mentor as he said. He did not even use the TMTT system. Like Woolf, Gengler made millions of dollars *selling* the TMTT system, not using it.

40.    Woolf and Gengler also lied about how simple, easy-to-use, and reliable the "proven" TMTT strategies were. They both described the TMTT system as having been designed for individuals with little or no experience, and they assured seminar attendees that they could make money no matter what if they just followed the steps laid out in the TMTT program. Both Woolf and Gengler assured attendees that the TMTT system would pay for itself and represented that 96% of TMTT purchasers who bought the "platinum" package (including software, advanced courses, and personal mentoring) made enough money in their first year using the TMTT system to pay off their TMTT purchase and still realize a profit.

41.    In fact, Woolf and Gengler knew that those representations were false. So did the other Defendants. Based on their own unsuccessful experiences, they knew that the TMTT system was far from fool proof.   Woolf and Gengler knew that the inexperienced individuals to whom they marketed TMTT products would be overwhelmed and frustrated by the TMTT material and probably would not make any money using the system. They also knew that the 96% success rate they were touting was false, as it had been told to them by Whitney without any factual support.

12

42.     At the three-day TMTT seminars, Woolf and Gengler also introduced attendees to members of the TMTT staff called "success coaches," whom they described as experienced and successful professionals available to give attendees assistance and advice. Attendees were instructed to bring documents detailing their net worth for review by the "success coaches," purportedly to assist them in devising an overall financial strategy.

43.     In fact, Woolf, Gengler and the other Defendants knew that the TMTT "success coaches" were not experienced or successful practitioners of TMTT, and that the only purpose of the portfolio review was to see how much money a particular seminar group had and to identify those individuals with more money to spend on TMTT products. "Success" coaches were used to convince attendees to do whatever was necessary, no matter the consequences free up money for TMTT products or trading. Woolf, Gengler and other Whitney employees also personally reviewed attendees' financial statements and also advised them to free up cash to fund their purchase of TMTT products or trading.

44.     Woolf, Gengler and other TMTT staff encouraged seminar attendees to use credit cards to finance their TMTT packages and falsely claimed to have done so themselves. They even provided attendees with scripts TMTT had created for customers to use to obtain higher credit limits from their credit-card companies. This tactic was particularly insidious, as Whitney, Woolf and Gengler knew that, if customers had to borrow money and obtain more credit to pay for TMTT products, they certainly would not have the funds needed to successfully implement the TMTT program.

13

45.     Woolf and Gengler and other TMTT staff stressed to seminar attendees that the key to success with TMTT was "personal mentoring," which they both falsely claimed to have purchased for themselves. Woolf and Gengler represented that TMTT mentors were experienced professionals who had been carefully scrutinized by Whitney. They claimed that the TMTT mentors would work "side-by-side" with TMTT purchasers to both explain and demonstrate exactly how the TMTT system worked, thus preventing mistakes and accelerating purchasers' understanding of the TMTT strategies and their realization of TMTT-related income.

46.     In fact, Whitney, Woolf, and Gengler knew that the representations made about TMTT mentors were false. Neither of the individuals Woolf and Gengler claimed to have hired as a mentor had ever worked for TMTT in that capacity and neither of them had ever been paid by Woolf or Gengler. Woolf and Gengler also knew that Whitney hired people with little or no experience or education to be mentors. As one mentor testified at trial, he had been hired by Whitney less than a year after he attended a three-day seminar conducted by Gengler. That mentor had not even completed his advanced courses, and he had not been successful using the TMTT system.

47.     The former TMTT mentor described how Whitney required mentors to set up home offices with state-of-the-art computer equipment and software to create the illusion that they were full-time professional traders, but Whitney did not require mentors to verify their biographies or produce records of their trading activities. The mentor testified that he had personally recruited other mentors who were not experienced or professionals, and he stated that most of the TMTT mentors were beginners like him who had no mastery of the TMTT "system." He also testified that, despite the image they

14

projected, most TMTT mentors did not make any money using the system and, instead, all TMTT mentors earned their living from the fees they were paid by TMTT.

### Other TMTT Speakers Repeated Woolf and Gengler's Misrepresentations

48.     Upon information and belief based on the testimony and evidence presented at the Woolf/Gengler criminal trial, all TMTT sales speakers made substantially similar misrepresentations to those made by Woolf and Gengler.

49.     The evidence presented at trial established that (1) Woolf created the PowerPoint presentation that all TMTT sales speakers used at the TMTT seminars, (2) Whitney required new TMTT sales speakers to attend Woolf's seminars to learn how to sell the system, (3) some TMTT sales speakers videotaped Woolf's presentations to better adopt her techniques at their seminars, (4) all speakers misrepresented the 96% success rate, and (5) all speakers told "hard luck" stories similar to Woolf's and Gengler's about their own experiences with TMTT.

50.     Woolf and Gengler also admitted at their criminal trial that all TMTT speakers repeated many of the fraudulent misrepresentations at issue in that case, including the misrepresentations regarding the TMTT success rate; the claims that TMTT "mentors" were experienced professional traders; and the misleading representations regarding the "success coaches."

### TMTT Purchasers Enticed by TMTT Misrepresentations

51.     TMTT purchasers thought that they were making an investment in their "education," much like a college student would. As such, those purchasers sought assurance that (1) the people who would be educating them were qualified and competent; (2) the information and theories they would be taught were effective, reliable,

and understandable, even by someone with little or no experience; and (3) others who had purchased the TMTT system had been successful using it.

52.     Every one of the TMTT purchasers who testified at the Woolf/Gengler criminal trial stated that they their decisions to invest in the TMTT system was influenced by the misrepresentations Woolf and Gengler made regarding (1) their own use of the TMTT system, (2) the qualifications and expertise of the TMTT instructors and mentors, (3) the ease with which even novices can learn and implement the TMTT strategies, (4) the "foolproof" nature of those strategies, and (5) the success enjoyed by previous TMTT purchasers.

53.     As the jury in the Woolf/Gengler criminal trial found, those misrepresentations were "material," in that they were likely to influence a reasonable person's decision whether to purchase the TMTT system.

54.     The testimony of the TMTT purchasers further established that, in reality, (1) the TMTT material was confusing and difficult to understand; (2) the software was difficult to use; (3) the advanced classes they purchased were held infrequently and required expensive travel; (4) much of the information contained in the TMTT materials was available elsewhere for free; (5) following TMTT strategies precisely did not always work; (6) mentors were unqualified and unhelpful and often could not answer simple questions; (7) many purchasers were not allowed to meet with their mentors until they completed certain advanced courses; and (8) it was impossible to use the TMTT system with only a minimal time commitment, as promised by TMTT sales speakers.

55.     Contrary to the TMTT sales speakers' claims of a 96% success rate among previous purchasers, none of the purchasers who testified at the Woolf/Gengler trial were

286818v.1

able to make enough money with TMTT to even pay for their TMTT packages. Many of them sought refunds, but all who did so were denied.

### Whitney's Liability for the Fraudulent TMTT Market Practices

56.    At all times pertinent to the allegations made herein, the TMTT sales speakers and staff members acted as agents for and under the control of Whitney. All of the fraudulent conduct by TMTT speakers and sales staff occurred within the course and scope of activity those agents undertook on behalf of Whitney. As such, Whitney is liable for the negligent or fraudulent acts of the TMTT sales speakers and staff members.

57.    The evidence presented at Woolf and Gengler's criminal trial establishes that Whitney was aware of the fraudulent conduct of its sales staff and either participated in or knowingly condoned many of the misrepresentations at issue in this complaint. Specifically, the evidence established that:

- Whitney knew TMTT was not a proven system that novices could use to make money;

- Whitney knew that its claims of a 96% success rate had no basis in fact;

- Whitney knew that TMTT sales speakers and mentors were not experienced professional traders;

- Whitney knew that TMTT sales speakers and mentors made their living working for TMTT, not trading stocks;

- Whitney knew that its sales speakers lied about their personal experiences with TMTT products;

- Whitney allowed its TMTT sales speakers to make false claims without sufficient monitoring or intervention;

- Whitney told its sales staff that they could claim to have paid for TMTT products even though Whitney knew that they had not been charged for those products.

58.    One TMTT speaker further testified that:

17

- Whitney knew that he misrepresented the financial success he had using TMTT;

- Whitney knew when it hired him that he was not an expert and did not make a living using the TMTT system;

- Whitney promulgated the 96% success rate to sales speakers without any explanation of its factual basis.

## IV.  CLASS ACTION ALLEGATIONS

59.     Class Definition:  Pursuant to Fed. R. Civ. P. 23(b), Plaintiffs bring this action on behalf of themselves and all others similarly situated, as members of the proposed Plaintiff Class.  The proposed Plaintiff Class is defined as follows:

All persons who paid to attend a TMTT seminar and/or purchased TMTT products or services, and who have not subsequently received a full refund of the money they spent on those products or services.

60.     Numerosity:  The members of the Class are so numerous that their individual joinder would be impracticable in that: (a) the Class includes thousands of individual members; (b) the precise number of Class members and their identities are unknown to Plaintiffs but are well known to Defendant and can easily be determined through discovery; (c) it would be impractical and a waste of judicial resources for each of the thousands of individual Class members to be individually represented in separate actions; and (d) the relatively small amount of damages suffered by some of the Class members makes it economically unfeasible for those Class members to file an individual action to protect their rights.

61.     Commonality/Predominance:   Common questions of law and fact predominate over any questions affecting only individual Class members.   These common legal and factual questions include, but are not limited to, the following:

- whether TMTT sales speakers made material misstatements or omissions to TMTT purchasers;

- whether TMTT sales speakers participated in and pursued the fraudulent scheme or course of business complained of;

- whether Whitney participated in and pursued the fraudulent scheme or course of business complained of;

- whether TMTT sales speakers alleged acts were deceptive or unfair trade practices under the FDUTPA;

- whether TMTT sales speakers acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

- whether Whitney knew that TMTT sales speakers omitted and/or misrepresented material facts;

- whether Whitney properly monitored or intervened to prevent fraudulent conduct by TMTT sales speakers;

- whether the members of the Class were damaged by the fraudulent scheme or course of business complained of and, if so, the proper measure of such damages; and

- whether Whitney is liable for the harmful acts of TMTT sales speakers.

62.    Typicality:   Plaintiffs' claims are typical of the claims of the Class members.  Plaintiffs and all Class members have been injured by the same wrongful practices engaged in by the TMTT sales peakers and Whitney.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

63.    Adequacy:   Plaintiffs will fully and adequately assert and protect the interests of the Class.  Plaintiffs have retained counsel who is experienced in class actions and complex mass tort litigation.  Neither Plaintiffs nor their counsel have interests contrary to or conflicting with the interests of the Class.

286818v.1

64.    Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims by each of the Class members is economically unfeasible and impractical. While the aggregate amount of the damages suffered by the Class is in the millions of dollars, the individual damages suffered by each Class member as a result of the wrongful conduct by Defendant do not warrant the expense of individual lawsuits, which according the standard-form TMTT purchase agreement, must be pursued in Florida. Even if the individual damages were sufficient to warrant individual lawsuits, the court system would be unreasonably burdened by the number of cases that would be filed.

65.    Plaintiffs do not anticipate any difficulties in the management of this litigation.

## V.    CLASSWIDE PRESUMPTION OF RELIANCE

66.    As the evidence presented in the Woolf/Gengler criminal trial illustrates, Whitney, Woolf and Gengler, and other members of the TMTT sales staff engaged in a common course of conduct to misrepresent to TMTT purchasers (1) the nature and extent of their own use of and success with the TMTT system, (2) the qualifications and expertise of the TMTT instructors and mentors, (3) the ease with which inexperienced purchasers can learn and implement the TMTT strategies, (4) the "foolproof" nature of those strategies, and (5) the success enjoyed by previous TMTT purchasers. Indeed, the jury in that trial specifically found beyond a reasonable doubt that Woolf and Gengler had engaged in a conspiracy to carry out that fraudulent scheme.

286818v.1

67.     In carrying out that "common fraudulent scheme" to defraud TMTT purchasers, Whitney and the TMTT sale staff made the same or substantially similar misrepresentations to all TMTT purchasers.

68.     As the jury in the Woolf/Gengler criminal trial concluded, the uniform misrepresentations made to TMTT purchasers were material, in that they were of such a nature that it can be presumed that TMTT purchasers would rely on them in decided to buy TMTT packages.

69.     Thus, individual proof of reliance is not a prerequisite to classwide recovery, as it can be presumed that all Class Members relied on the uniform misrepresentations made in the course of the common fraudulent scheme undertaken by Whitney, Woolf and Gengler, and other TMTT sales staff.

## VI.    CAUSES OF ACTION

### First
### Fraud

70.     Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 68 above.

71.     As discussed in paragraphs 1 through 68 and elsewhere herein, Whitney and the TMTT sales speakers provided TMTT purchasers with false or misleading information and failed to disclose material facts about TMTT products and services, including but not limited to the extent of the sales speakers' use of those products, the success rate of previous TMTT purchasers, the expertise of TMTT instructors and mentors, the effectiveness of the TMTT program, and the ease with which inexperienced purchaser could learn and implement TMTT system.  These misrepresentations and

omissions were made with the intention of deceiving the Plaintiffs to obtain an unjust advantage over them.

72.    The misrepresentations and omissions made by Whitney and the TMTT sales speakers, upon which the TMTT purchasers reasonably and justifiably relied, actually induced TMTT purchasers to decide to purchase TMTT products and services.

73.    The fraudulent actions of Whitney and the TMTT sales speakers have caused damage to the TMTT purchasers, and as result, the TMTT purchasers are entitled to damages and other legal and equitable relief.

## Second
## Negligent Misrepresentation

74.    Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 68 above.

75.    As discussed in paragraphs 1 through 68 and elsewhere herein, Whitney and the TMTT sales speakers provided TMTT purchasers with false or misleading information and failed to disclose material facts about TMTT products and services, including but not limited to the extent of the sales speakers' use of those products, the success rate of previous TMTT purchasers, the expertise of TMTT instructors and mentors, the effectiveness of the TMTT system, and the ease with which inexperienced investors could learn to implement the TMTT system.

76.    At an absolute minimum, Whitney and the TMTT sales speakers negligently misrepresented and/or negligently omitted material facts about TMTT products and services, including but not limited to the extent of the sales speakers' use of those products, the success rate of previous TMTT purchasers, the expertise of TMTT

286818v.1

instructors and mentors, the effectiveness of the TMTT system, and the ease with which inexperienced purchasers could learn to implement the TMTT system.

77.     The misrepresentations and omissions made by Whitney and the TMTT sales speakers, upon which the TMTT purchasers reasonably and justifiably relied, actually induced TMTT purchasers to decide to purchase TMTT products and services.

78.     The negligent actions of Whitney and the TMTT sales speakers have caused damage to the TMTT purchasers, and as result, the TMTT purchasers are entitled to damages and other legal and equitable relief.

## Third
## Civil Conspiracy

79.     Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 68 above.

80.     Whitney and the TMTT speakers conspired to fraudulently induce TMTT purchasers to purchase TMTT products, and they provided TMTT purchasers with false or misleading information and/or failed to disclose material facts about TMTT products and services in furtherance of that conspiracy.

81.     TMTT purchasers suffered damages as a result of the acts performed by Whitney and the TMTT speakers pursuant to their conspiracy to fraudulently induce the purchase of TMTT products and services.

82.     As a result, Whitney and the TMTT speakers are liable to the TMTT purchasers for damages and other legal and equitable relief.

286818v.1

## Fourth
### Deceptive and Unfair Trade Practices

83.     Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 68 above.

84.     Whitney and The TMTT speakers are also liable to the Plaintiffs under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*

85.     The actions taken by and the omissions made by Whitney and the TMTT sales speakers discussed herein constitute unfair or deceptive acts or practices in the conduct of trade or commerce.

86.     Specifically, the fraudulent, deceptive, unethical, and unscrupulous actions and inactions of Whitney and the TMTT sales speakers in marketing and selling TMTT products and services were material to the TMTT purchasers' decisions to purchase TMTT packages and create liability under this law.

87.     As a result, Whitney and the TMTT speakers are liable to the TMTT purchasers for damages and other legal and equitable relief.

### Jury Demand

88.     Plaintiffs demand a jury as to all issues and claims triable by jury.

### Prayer for Relief

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class Members, demands judgment in their favor and against Defendants as follows:

a.     For an Order certifying the Class pursuant to Fed. R. Civ. P. 23 appointing Plaintiffs as the representatives of the Class, and appointing counsel for Plaintiffs as counsel for the Class;

24

286818v.1

    b.     For an award of all compensatory and other damages suffered by Plaintiffs and the Class;

    c.     For an award of all costs incurred by Plaintiffs in pursuing this action;

    d.     For an award of reasonable attorneys' fees; and

    e.     For any other legal or equitable relief the Court deems appropriate.

Respectfully submitted this 7th day of October 2009, electronically using the CM/ECF system.

**COLLING GILBERT WRIGHT & CARTER**
Local Counsel for Plaintiffs
801 N. Orange Avenue, Suite 830
Orlando, Florida 32801
Telephone:    407-712-7300
Facsimile:    407-712-7301
E-mail: mcerasa@TheFloridaFirm.com


___/s/___ Michael D. Cerasa_____
Michael D. Cerasa (Fla. Bar No. 0015085)

-and-

JOSEPH C. PEIFFER, ESQ.
DANIEL J. CARR, ESQ.
**FISHMAN HAYGOOD PHELPS**
  **WALMSLEY WILLIS & SWANSON, L.L.P.**
Class Counsel, pending admission *pro hac vice*
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana, 70170
Telephone:  504-586-5252
Facsimile:  504-586-5250
Email: jpeiffer@fishmanhaygood.com
      dcarr@fishmanhaygood.com

Co-Counsel for Plaintiffs

286818v.1